## KELLY v. CLEMENTS.

1. FRAUD—CORPORATIONS—LIABILITY OF DIRECTORS—EVIDENCE.
   Without actual evidence that the directors of a corporation authorized the issuance or use of a fraudulent circular, fraud should not be inferred as to a member of the board who did not profit personally by the representations.[1]

2. SAME—EVIDENCE—PAROL TESTIMONY.
   Parol proof of contents of a land contract, not within the jurisdiction of the court, was properly excluded, no evidence being offered to excuse the failure to produce the written instrument and no attempt having been made to procure competent evidence by commission. *Phillips* v. *Benevolent Society*, 125 Mich. 186 (84 N. W. 57).

3. SAME—VENDOR AND PURCHASER—STOCKHOLDERS.
   Representations made in a circular issued by a development corporation to the effect that the corporation owned certain lands, were not of a fraudulent character, where it appeared that the company owned an interest in the property under a land contract.

4. VENDOR AND PURCHASER—FREEHOLDER—LAND CONTRACTS.
   The vendee of realty under a land contract is a freeholder.

5. FRAUD.
   Upon a record showing that representations regarding the value of land owned by a corporation as described in a circular were vague and uncertain, and that after being cleared and cultivated the property was more valuable than the circular stated, it was not erroneous to direct a verdict for defendant, a director, that plaintiff claimed participated in the fraud.

Error to Wayne; Van Zile, J. Submitted January 27, 1913. (Docket No. 91.) Decided April 8, 1913.

Case by Mary E. Kelly against Charles L. Clements

[1] The question of the rescission of a subscription to corporate stock for fraud or misrepresentation is the subject of a note in 33 L. R. A. 721.

for fraud. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*McHugh, Gallagher & McGann,* for appellant.

*Walsh & Walsh,* for appellees.

BROOKE, J. The Central American Commercial Company of Honduras was incorporated under the laws of the State of Maine on June 8, 1901. The original incorporators were residents of Ohio. One Colonel Pennington of Cincinnati seems to have been the principal promoter of the concern. The object of the corporation was the purchase and development of banana plantations in Central America.

Pennington undertook to interest certain business men of Detroit in the undertaking, and succeeded in selling stock in the concern to the five defendants. Defendant Clements became connected with the company as stockholder, director, and treasurer prior to July, 1901. The other four defendants became stockholders and directors at a later date.

The company seems to have secured title by way of an executory land contract to a tract of 1,110 acres upon the Chamelecon river in Honduras. In order to secure capital with which to clear and plant, it proposed to issue and sell what it denominated a "Title Bond or Contract for Sale of Real Estate." By the terms of this instrument the purchaser agreed to pay the sum of $5 per month for each share purchased until $150 per share had been paid. The contract recites that:

"Each share is the undivided one-thousandth part of one thousand acres in a tract of land containing eleven hundred and ten acres owned by the Central American Commercial Company. * * * The said Central American Commercial Company agrees to clear the land described herein, and to plant same with banana plants, and to have the same in full bearing within twenty-five months from the date of this

contract, and the said company further agrees to care for and cultivate said banana plants, to harvest and market the bananas and pay to the said ........, his heirs, etc., all the net profit derived from the sale of the bananas raised upon said land except ten per cent. of the net profits thereof, which is to be retained by the company. The said ........ having the option, at any time after full payment, to have his one-thousandth interest for each share herein represented in said land set off to him and receive a deed for the same."

On July 15, 1901, the plaintiff purchased one of these "Title Bonds" representing 10 shares or acres, and on that day and thereafter paid therefor to the company the full purchase price of $1,500. Her "bond" was executed by the corporation by J. S. H. Pennington, president, and Charles H. Clements, treasurer.

In all, the company sold some 128 of these acre-shares, some (perhaps most) of which were never fully paid up.

It entered into possession of its land in Honduras, which at the commencement of its operations was heavily timbered, and cleared and planted with bananas 528 acres. In June, 1902, Mr. Bruce Goodfellow, one of the defendants, became general manager. He spent much of his time upon the plantation up to 1905. The enterprise proved a failure because of the lack of adequate transportation facilities. It appears that the Ulua Transportation Company held a concession from the government of Honduras which gave it the rights of navigation upon the Chamelecon river. This company had entered into a contract with the Central American Commercial Company to transport the fruit to the port by way of the Chamelecon river. This river, it seems, is, in places, very shallow, and navigation is often obstructed by sunken logs or snags. The navigation company did not have boats of sufficient capacity to handle the fruit, and was slow

in acquiring such and in ridding the river of snags so as to permit them to be operated. By the summer of 1904, however, the transportation company placed in commission a boat it had procured to be specially built in Chicago, and had cleared the river from obstructions, so that it was possible to run this boat up the stream as far as the banana plantation. One or more trips were made, and considerable fruit was taken out and marketed.

At this point an unusually severe tropical storm or cloud-burst swept the country. The Chamelecon river rose 22 feet. Its banks, being apparently of alluvial character, were undermined, and much soil, as well as many trees, were swept down in the torrent and lodged lower down in the river, where the stream was wider and shallower. In some places the obstructions so created caused the river to leave its course entirely and seek new channels. This disaster rendered the river entirely unnavigable for the larger boat until the obstructions were removed. In the meantime the plantation was producing bananas abundantly, which, under the prevailing conditions, could not be marketed.

The record shows that the land is exceedingly fertile; that it is exceptionally suited for banana cultivation; and that it will produce from 750 to 1,000 bunches per acre. If adequate transportation facilities existed, the net profit on each bunch would be from 35 cents to 37 cents. Confronted by the situation described, the Commercial Company cast about for other means of reaching the market. The railroad was only 10 miles distant, but to build and equip a branch would cost $50,000 or upwards. It considered the feasibility of using traction road engines, but was advised against their practicability. Finally, in 1905 or 1906, the stockholders transferred their stock to one Carew, who in consideration thereof assumed the debts and obligations of the concern. The land seems

to have been deeded directly to him at the instance of the company, though the record is not clear upon this point. At this time plaintiff's contract had been fully paid up.

As a result of the whole venture the Detroit stockholders, including the five defendants, lost their entire investment, amounting to many thousands of dollars, and the bond or contract holders are in like plight.

The plaintiff seeks to recover her investment from the five defendants, who were directors at the time the company ceased to do business. Her declaration alleges that she was induced to invest by reason of false and fraudulent representations made to her at the time she purchased her "bond" in July, 1901. It appearing upon the trial that none of the defendants, except Charles H. Clements, was officially connected with the company at that time, she voluntarily discontinued as to all except him. A verdict having been directed in his favor, plaintiff reviews the case in this court by writ of error.

Her allegations of fraud are based particularly upon a prospectus or circular which was shown to her by one Stevens, an agent of the company, who sold her the "bond." This circular contains a series of letters from different individuals relative to the land in question, its fitness for banana culture, its title, its value, the probability of large profits, and the character of the transportation facilities. Plaintiff charges fraudulent misrepresentations as to (1) the title to the land; (2) the value of the land; (3) the character of the transportation facilities.

The prospectus which contained the alleged misrepresentations is not shown to have been issued at the instance or with the consent of any of the defendants; indeed, it is not shown to have been issued or authorized by the corporation. While the presumption that it was so authorized and, at the time of its issuance, had the assent of the then board of directors is

persuasive, we do not think this presumption, suspicion, or belief should be accepted in place of actual evidence in a case of this character, where fraud is charged.

But, assuming that the prospectus was duly authorized by the corporation, and received the active assent of defendant .Clements, and that the statements therein contained were false, it may still be doubted (there being no evidence that Clements profited personally by the sale to plaintiff) whether he would be liable. See *Getchell* v. *Dusenbury,* 145 Mich. 197 (108 N. W. 723) ; *Massey* v. *Luce,* 158 Mich. 128 (122 N. W. 514). We find it unnecessary, however, to consider this phase of the case, for the reason that we agree with the conclusion of the learned circuit judge that there is no competent evidence in the record tending to establish the falsity of the representations.

It is said that it was represented that the corporation owned the land, whereas it had at that time only an executory contract for its purchase.

Parol evidence of the contents of the alleged land contract to the corporation and of the deed to Carew was offered and excluded. These instruments were, apparently, beyond the jurisdiction of the court, but it was not shown that they were either lost or destroyed; nor was proof offered excusing the failure to produce the originals or copies thereof. Such evidence, it would seem, could readily have been procured by commission or otherwise. The evidence was properly excluded. *Phillips* v. *Benevolent Society,* 125 Mich. 186 (84 N. W. 57).

But, in any event, the record clearly shows that, even if the title was evidenced by contract instead of by deed, that fact had no bearing upon the loss sustained by plaintiff. The purchase price was nearly, if not quite, paid at the time that the company abandoned its project. Had the company taken title to the land by way of deed and given a mortgage to the

vendor to secure an unpaid portion of the purchase price, it would scarcely be contended that it was not the "owner," within any ordinary definition of that term. The title it actually had, if the excluded evidence is considered, is in essence the same. We have held that the vendee in a land contract is a freeholder. *Starkweather* v. *Chatfield*, 149 Mich. 443 (112 N. W. 1071), and cases there cited. See, also, *Bowen* v. *Lansing*, 129 Mich. 117 (88 N. W. 384, 57 L. R. A. 643, 95 Am. St. Rep. 427) ; *Convis* v. *Insurance Co.*, 127 Mich. 616 (86 N. W. 994) ; 28 Am. & Eng. Enc. Law (2d Ed.), p. 234.

We do not overlook the fact that plaintiff's contract contains the following language:

"This contract represents ten shares of the one thousand shares in the property described as follows, to wit: Each share is the undivided one-thousandth part of one thousand acres in a tract of land * * * owned by the Central American Commercial Company."

But, as before pointed out, such evidence as there is in the record indicates the substantial truth of the representation as to ownership. The representations as to value in the prospectus are vague and uncertain. All the evidence upon the question in the record is to the effect that the land is valuable and, when cleared, planted, and producing, worth much more than the price which complainant paid.

The evidence upon the question of transportation facilities is based wholly upon statements contained in the prospectus. Again, assuming that defendant Clements is responsible for the contents of the prospectus, we are unable to find in the record any evidence that, upon this point, any untruthful representation was therein made. The plantation is located upon the Chamelecon river. In 1901, when the plaintiff secured her "bond," that river was unquestionably navigable for boats of light draught. It continued so

until the unusual tropical storm in the fall of 1904. That storm, followed by a devastating torrent, rendered the river nonnavigable for the large boat which the Ulua Transportation Company had provided at large expense to take care of the fruit shipments from the plantation in question. The smaller craft still able to navigate the river seem to have been entirely inadequate to handle the product; and therefore it could not be placed upon the market. This condition resulting from "an act of God" was in no sense attributable to the defendant Clements.

We are satisfied from a careful reading of the record that no fraud was practiced upon the plaintiff, but that her loss resulted from conditions which changed a probably profitable venture into an unworkable and disastrous speculation for all concerned.

We are of opinion that the motion for a new trial was properly denied.

The judgment is affirmed.

STEERE, C. J., and MOORE, MCALVAY, STONE, OSTRANDER, and BIRD, JJ., concurred. KUHN, J., did not sit.